UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ x

OLALEKAN ABOUBAKAR, CHRISTIAN BATISTA,
BRIDGET CAPOBIANCO, ANATOLIY ELKIN, JAMEL
LOFTIN, BRANDON WINN, on behalf of themselves and
all others similarly situated, and DAVID AVRAHAM,
LEONARD BRUCE, TROY DANIELS, DANIELA
GONZALEZ, RODDRICK INGRAM, ANDREW LEE,
SIDNEY LOUIS,

**FIRST AMENDED CLASS ACTION COMPLAINT**

                                Plaintiffs,

1:20-CV-01716 (ARR) (RLM)

-against-

Jury Trial Demanded

THE CITY OF NEW YORK, CAPTAIN WILLIAM
TOBIN, LIEUTENANT THOMAS BOUYER,
SERGEANT KELLEY SEALY, CAPTAIN JOHN
MARCHICA, ASSISTANT CHIEF GARY STREBEL,
ASSISTANT CHIEF DONNA JONES, ROBERT
PITTMAN, ANDREW TOWNES, DENZIL SNODDY,
JOHN/JANE DOES 1-5 (representing municipal officials
responsible for the operation and conditions of Brooklyn
Central Booking but who have not yet been identified by
defendants),

                                Defendants.

------------------------------------------------------------------------ x

## PRELIMINARY STATEMENT

1. This is a civil rights class action, brought pursuant to 42 U.S.C. § 1983, in which the Plaintiff Class Representatives Olalekan Aboubakar, Christian Batista, Bridget Capobianco, Anatoliy Elkin, Jamel Loftin and Brandon Winn ("Plaintiff Class Representatives"), on behalf of themselves and all other similarly situated, as well as the individual Plaintiffs, David Avraham, Leonard Bruce, Troy Daniels, Daniela Gonzalez, Roddrick Ingram, Andrew Lee and Sidney Louis, allege that the City of New York and officials and employees of the New York City Police Department ("NYPD") and the Department of Citywide Administrative Services ("DCAS") violated their rights under the Due Process Clause of the Fourteenth Amendment to

the United States Constitution, during the Class Period of April 8, 2017 to the present ("Class Period"), by subjecting them to inhumane conditions of confinement while they were pre-arraignment detainees in Brooklyn Central Booking ("BCB"), an NYPD holding facility located at the Criminal Courthouse, 120 Schermerhorn Street, in Brooklyn ("the Class"). Plaintiff Class representatives and Plaintiffs were each held in BCB for several hours on separate dates from 2017 to 2019.

2. In 2013, the plaintiffs in *Cano v. City of New York, et al.*, 13-CV-3341 (E.D.N.Y.), brought an identical suit challenging the unconstitutional conditions that were present in BCB when they were held in the facility on separate dates from 2010 to 2013. The district court, after discovery, granted the defendants' motion for summary judgment. In the appeal of the *Cano* case, under the caption *Darnell v. Pineiro*, 849 F.3d 17 (2d Cir. 2017), the Second Circuit reversed, stating that the "plaintiffs paint a picture of BCB that is alarming and appalling" and have "adduced substantial evidence, much of it uncontroverted, that they were subjected to appalling conditions of confinement to varying degrees and for various time periods." *Id.* at 26, 37.

3. Despite the Second Circuit's decision, Defendants have done nothing to improve the conditions in BCB and, as a result, the Class has been subjected to the same unconstitutionally inhumane conditions.

4. The unconstitutional conditions that existed in BCB when Plaintiffs and the Class were held in the facility were and remain a policy, practice and/or custom of the City of New York.

5. Plaintiffs and the Class seek: (1) a declaratory judgment that the conditions of confinement in BCB during the Class Period were unconstitutional; (2) an injunction requiring

2

Defendants to remediate the unconstitutionally inhumane conditions in BCB; (3) compensatory damages for the injuries caused by Defendants' unlawful conduct; and (4) punitive damages assessed to deter such intentional or reckless deviations from well-settled constitutional law.

## JURISDICTION & VENUE

6. This action is brought pursuant to 42 U.S.C. § 1983 and the Fourteenth Amendment to the United States Constitution. Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 and 1343.

7. Venue is proper in the Eastern District of New York pursuant to 28 U.S.C. § 1391(b) and (c) because the City of New York and the individual Defendants are located in this District and the events at issue occurred here.

## JURY TRIAL

8. Pursuant to Fed. R. Civ. P. 38, Plaintiff Class Representatives and Plaintiffs demand a jury trial.

## PARTIES

9. Plaintiff Class Representatives and Plaintiffs are residents of the State of New York or the State of New Jersey.

10. The City of New York is a municipal corporation organized under the laws of the State of New York.

11. Captain William Tobin, Lieutenant Thomas Bouyer, Sergeant Kelley Sealy, Captain John Marchica, Assistant Chief Gary Strebel, Assistant Chief Donna Jones, Robert Pittman, Andrew Townes and Denzil Snoddy are some of the officials and employees of the NYPD, DCAS and the City who were responsible for the conditions of confinement in BCB when plaintiffs were held in the facility. John/Janes Does 1-5 are other municipal officials and

3

employees who were responsible for the conditions of BCB when plaintiffs were held in the facility, but who have not yet been identified by Defendants. The individual Defendants acted under color of state law at all relevant times herein. The individual Defendants are sued in their individual capacities.

## CLASS ALLEGATIONS

12. Plaintiff Class Representatives seek to represent a class, pursuant to F.R.C.P. 23(b)(2) and (b)(3), on behalf of themselves and all other similarly situated individuals, and seek to represent a class comprised of all persons who were detained in BCB from April 8, 2017, to the date on which Defendants are ordered to remedy the unconstitutionally inhumane conditions in BCB, or otherwise remedy those conditions.

13. Plaintiff Class Representatives and the Class seek a declaration that the inhumane conditions of confinement in BCB during the Class Period were unconstitutional; an order requiring Defendants to remediate the unconstitutionally inhumane conditions; compensatory damages for the injuries caused by Defendants' unconstitutional conduct; and punitive damages.

14. The members of the class are so numerous as to render joinder impracticable.

15. Upon information and belief, there have been and continue to be hundreds, if not thousands of persons detained each week in BCB, all of whom are members of the Class, and all whose federal constitutional rights have been or will be violated by the policy, practice and/or custom of maintaining unconstitutionally inhumane conditions in BCB.

16. The questions of law and fact common to the Class include whether the class members have common rights under the United States Constitution to be free from unconstitutionally inhumane conditions in BCB, whether Defendants' conduct in confining the

4

class members under these conditions violated those rights, and whether the inhumane conditions were a policy, practice and/or custom of the City of New York.

17. Plaintiff Class Representatives are adequate class representatives. The violations of law alleged by the Plaintiff Class Representatives stem from the same course of conduct by Defendants that violated and continue to violate the rights of members of the class. Moreover, the legal theory under which the Plaintiff Class Representatives seek relief is the same or similar to that on which the Class will rely.

18. Moreover, the harm suffered by the Plaintiff Class Representatives is typical of the harm suffered by the absent class members. Plaintiff Class Representatives have the requisite personal interest in the outcome of this action and will fairly and adequately protect the interests of the class.

19. The lawyers and law firms representing Plaintiffs and the Class specialize in civil rights cases and class actions and have litigated a variety of actions against governmental entities and their employees. Counsel has the resources, expertise and experience to prosecute this action. Counsel for Plaintiffs know of no conflicts among members of the Class or between counsel and members of the Class.

20. A class action is superior to other available methods for the fair and efficient adjudication of this controversy because (a) the prosecution of thousands of separate actions would be inefficient and wasteful of legal resources; (b) the members of the Class may be scattered throughout New York State and the tri-state area and are not likely to be able to vindicate and enforce their constitutional and statutory rights unless this action is maintained as a class action; (c) the issues raised can be more fairly and efficiently resolved in the context of a single class action than piecemeal in many separate actions; (d) the resolution of litigation in a

single forum will avoid the danger and resultant confusion of possible inconsistent determinations; (e) the prosecution of separate actions would create the risk of inconsistent or varying adjudications with respect to individuals pursuing claims against Defendants which would establish incompatible standards of conduct for Defendants; (f) Defendants have acted and will act on grounds applicable to all class members, making final declaratory and injunctive relief on behalf of all members necessary and appropriate; and (g) questions of law and/or fact common to members of the Class especially on issues of liability predominate over any questions that affect individual members.

## STATEMENT OF FACTS

**A.  Background**

21. The deplorable conditions that exist in BCB and the City of New York's other Central Booking facilities were the subject of a New York Times article, published March 23, 1990, entitled "*Trapped in the Terror of New York's Holding Pens*." As the Times reported,

> They are the holding pens and precinct house cells where people who have been arrested are warehoused - often for two or three days - before they are taken to court. Built decades ago for a different New York, they were meant to hold people for hours, not days, and they are by all accounts too small for the thousands of people now frequently crammed into them each week….There are no mattresses, no bedding, no clean clothing and no showers. The toilets, where there are toilets at all, are open bowls along the walls and often encrusted and overflowing. Meals usually consist of a single slice of baloney and a single slice of American cheese on white bread….People who have been through the system say it is not easy to forget. Some were threatened by other prisoners. Others were chained to people who were vomiting and stinking of the streets. With few phone privileges, many felt as if they were lost in a hellish labyrinth far from the lives they had been plucked from.

22. Further, thirty years ago, the City of New York and high-ranking City officials were put on notice of the conditions of BCB when, on March 6, 1990, the Legal Aid Society sent a letter to then-Deputy Mayor Milton Mollen, outlining, pursuant to Mollen's suggestion, the nature of the conditions in the City's Central Booking facilities.

23. The letter stated, in relevant part, as follows:

All court detention and central booking facilities are chronically overcrowded. There are no established limits for cell population. Some of the cells are less than 12 by 15 feet, and may be crammed with as many as 25 people. There is rarely seating for more than half of the detainees causing arrestees to stand or sit on the floor… even though arrestees are held for two or three nights, there are no sleeping facilities[,]" meaning that people "either do not sleep during their detention or must try to sleep on a cold, filthy concrete floor with nothing more than a jacket or shirt bundled up as a cushion. Often arrestees are crowded together, virtually lying on top of each other.

The toilets are either in full view or partly concealed by low partitions. They are often broken or backed up. Occasionally, toilets overflow onto the floor." [The cells] are filthy and malodorous … infested with roaches and rats and there is usually garbage all over the floor. The odor is so pungent that attending officers have been observed burning incense. [The cells are] poorly ventilated, and some are not ventilated at all. [The cells in Brooklyn are located in the sub-basement] with no provision for ventilation. In hot summer months, long hours spent in a stifling, vile-smelling, unventilated holding pen are unbearable. Lighting is dim and often non-existent."

[Once an arrestee reaches a Central Booking facility the City] provides only bologna and cheese sandwiches and only at specified times. Because of the cramped conditions of the

cells, detainees often have to eat near the open toilet. Many detainees, who are in transit when the sandwiches are given out, must endure long periods with no food at all. [There is] "no medical care in the pens. Prisoners with serious problems may remain untreated for several days. Diabetics and AIDS victims may be unable to obtain their medicine. Physically sick and psychotic arrestees are thrown in with the others and mingle in close proximity for days. Arrestees who request medical attention are discouraged from pursuing their requests. [The arrestees are told that medical care is] "available only at a hospital and will delay their arraignment by a day or more. [Only if an arrestee is] insistent or obviously ill, for example, bleeding or unconscious, is he or she taken to a hospital.

24. The Legal Aid Society's March 6, 1990 letter was received and reviewed by then-Deputy Mayor Mollen and other City officials. The municipal officials confirmed that the conditions described in the letter did in fact exist.

25. The conditions described in the Legal Aid Society's letter still existed in BCB when *Cano v. City of New York* was filed in the Eastern District in 2013.

26. The conditions described in the Legal Aid Society's letter existed in large part in BCB when the Plaintiffs and the Class in this case were held in the facility.

27. In addition to the above, the City of New York and high-ranking City officials were put on notice of the inhumane conditions of BCB almost twenty years ago when *Spinner v. City of New York*, *et al*., 01-CV-2715 (E.D.N.Y.) was filed, which like *Cano v. City of New York,* alleged unconstitutional jail conditions in BCB in violation of the multiple plaintiffs' rights under the Due Process Clause. *See, e.g., Spinner v. City of New York*, *et al.*, 2004 U.S. Dist. LEXIS 2541 (E.D.N.Y. Feb. 19, 2004).

**B.     The Plaintiffs**

28.     The plaintiffs in this case were held for at least several hours in BCB on separate dates ranging from 2017 to 2019 and were subjected to the conditions described *infra*.

29.     Olalekan Aboubakar was held in BCB after his arrest on August 6, 2017. Aboubakar, who suffers from a congenital heart condition and high blood pressure, was experiencing heart palpitations and a hand tremor in BCB, but his request to be taken to a hospital upon admission to BCB was denied.

30.     David Avraham was held in BCB after his arrest on May 7, 2019.

31.     Christian Batista was held in BCB after his arrest on April 8, 2017

32.     Leonard Bruce was held in BCB after his arrests on August 17, 2017, May 18, 2018, April 17, 2019, June 25, 2019, and July 17, 2019.

33.     Bridget Capobianco was held in BCB after her arrest on June 24, 2019.

34.     Troy Daniels was held in BCB after his arrests on November 7, 2017, August 27, 2018, and August 11, 2019.

35.     Anatoliy Elkin, who is 76 years old, was held in BCB after his arrest on August 5, 2019.

36.     Daniela Gonzalez was held in BCB after her arrest on May 23, 2019.

37.     Roddrick Ingram was held in BCB after his arrests on May 30, 2017, May 30, 2018, and June 28, 2019.

38.     Andrew Lee was held in BCB after his arrest on May 7, 2019.

39.     Jamel Loftin was held in BCB after his arrest on April 8, 2017.

40.     Sidney Louis was held in BCB after his arrest on December 27, 2019.

41. Brandon Winn was held in BCB after his arrests on October 15, 2018, October 17, 2018, and July 11, 2019.

**C.     The Conditions**

42. As a result of Defendants' unconstitutional conduct, Plaintiffs and the Class were subjected to inhumane conditions including those described below.

43. <u>Overcrowding</u>: For a substantial part of the time that they were held in BCB, the Plaintiffs and the Class were packed into overcrowded cells. Because the cells were so full, there was often only space to stand for hours at a time. When a space opened up, the Plaintiffs and the Class could sit or lie down on the filthy, hard ground. While some of the cells contained hard benches, there was not nearly enough bench space to accommodate its numerous occupants.

44. <u>Unsanitary Toilets</u>: Each cell at BCB contained one exposed toilet that lacked a seat, lid, or sufficient privacy partitions to conceal the user from his or her fellow detainees. The toilet rim and bowl, along with the surrounding floor and walls, were often covered with some combination of feces, vomit, urine and other excrement. The toilets were frequently clogged and would overflow. The smell was horrific and overbearing. Toilet paper was usually not provided to detainees; even upon request, the BCB officers chose instead to engage in personal conversations with each other, play on their cell phones, and ignore this and every other type of reasonable request.

45. <u>Garbage and Inadequate Sanitation</u>: The cells had garbage scattered over the ground as well as urine, feces and other excrement splattered in sections of the floor. Because there were no trash cans in the cells, detainees were expected to put their garbage on the floor. The overwhelming majority of Plaintiffs did not observe anyone clean the cells when they were

held in the facility and the one or two that observed a cleaning saw that is was quick, superficial and inadequate.

46. <u>Infestation</u>: Most of the Plaintiffs and the Class were held in cells which were infested with cockroaches, flies and other insects. Some of the Plaintiffs observed rodents in their cells.

47. <u>Lack of Toiletries and Other Hygienic Items</u>: Plaintiffs and the Class were not provided with basic toiletries, such as soap, tissues, hand wipes, hand sanitizer, toothbrushes or toothpaste. Moreover, as stated, detainees were denied toilet paper. Other types of hygienic items were simply not provided in BCB.

48. <u>Inadequate Nutrition and Water</u>: The food and water provisions in BCB were nutritionally inadequate. Plaintiffs and the Class were not provided with fresh, clean drinking water, and for most of the Plaintiffs and the Class, the only water available was from a sink that was adjacent to a filthy toilet. Adequate food was not provided. If sandwiches were offered, they were moldy, rotten, stale, or otherwise inedible. Some of the Plaintiffs and the Class were given a small box of cereal, but were not given plastic utensils or a bowl in which to eat the cereal. Some of the Plaintiffs and the Class were offered a small carton of milk, instead of water, but were unable to drink it because it was spoiled or beyond the expiration date. Even though the Plaintiffs and the Class were hungry and dehydrated, many feared consuming the impotable milk and inedible food that was offered out of fear that it would cause them to become sick and force them to utilize the horrid toilets.

49. <u>Extreme Temperatures and Poor Ventilation</u>: Most of the Plaintiffs and the Class were subjected to extremely cold or hot temperatures while they were held in BCB. Moreover, the cells in BCB lacked ventilation, which exacerbated the horrific odors caused by the toilets,

11

the overcrowding and the detainees who were not given the opportunity to wash themselves. Some officers in BCB have fans blowing on them, but not on the detainees.

50. <u>Sleep Deprivation</u>: After being arrested and held in a NYPD police precinct for hou rs, Plaintiffs and the Class were held overnight or for a substantial number of hours in BCB and suffered sleep deprivation because they were not provided with any sleeping provisions, such as mats, beds, cots, pillows or blankets. Some of the Plaintiffs were so desperate that they attempted to sleep on the filthy, hard floor or on one of the hard benches in the cells. Even if a detainee chose to disregard the filth, there was generally no room on the floor to lie down due to the overcrowding.

51. <u>Crime and Intimidation</u>: Plaintiffs and the Class were held in cells which were for the most part unsupervised and where BCB officers were deliberately indifferent to fights, theft, bullying and drug use. Violent criminals charged with crimes including murder were held in the same cells as minor offenders and some detainees threatened and assaulted the weaker detainees. Some Plaintiffs overheard their fellow detainees discussing their violent crimes. Moreover, some Plaintiffs observed detainees smoking marijuana in the cells, which the officers mostly ignored. Two of the Plaintiffs observed cocaine use in their cell.

**D.** **Municipal and Supervisory Liability**

52. Captain William Tobin, Lieutenant Thomas Bouyer, Sergeant Kelley Sealy, Captain John Marchica, Assistant Chief Gary Strebel, Assistant Chief Donna Jones, Robert Pittman, Andrew Townes and Denzil Snoddy were some of the municipal officials who were responsible for the conditions of BCB when Plaintiffs and the Class were held in the facility.

53. Captain William Tobin, Lieutenant Thomas Bouyer, Sergeant Kelley Sealy, Captain John Marchica, Assistant Chief Gary Strebel, Assistant Chief Donna Jones, Robert

12

Pittman, Andrew Townes and Denzil Snoddy were aware of the unconstitutional conditions of confinement that existed in BCB when Plaintiffs and the Class were held in the facility.

54. Captain William Tobin, Lieutenant Thomas Bouyer, Sergeant Kelley Sealy, Captain John Marchica, Assistant Chief Gary Strebel, Assistant Chief Donna Jones, Robert Pittman, Andrew Townes and Denzil Snoddy were aware of the conditions of confinement that existed in BCB during their tenure from personally observing the conditions.

55. Captain William Tobin, Lieutenant Thomas Bouyer, Sergeant Kelley Sealy, Captain John Marchica, Assistant Chief Gary Strebel, Assistant Chief Donna Jones, Robert Pittman, Andrew Townes and Denzil Snoddy were aware of the conditions of confinement that existed in BCB during their tenure from discussions with, and reports from, subordinates and other municipal officials and employees.

56. Captain William Tobin, Lieutenant Thomas Bouyer, Sergeant Kelley Sealy, Captain John Marchica, Assistant Chief Gary Strebel, Assistant Chief Donna Jones, Robert Pittman, Andrew Townes and Denzil Snoddy were aware of the conditions of confinement that existed in BCB during their tenure from reviewing documents about the conditions.

57. Captain William Tobin, Lieutenant Thomas Bouyer, Sergeant Kelley Sealy, Captain John Marchica, Assistant Chief Gary Strebel, Assistant Chief Donna Jones, Robert Pittman, Andrew Townes and Denzil Snoddy were aware of the conditions of confinement that existed in BCB during their tenure from letters, complaints from detainees and City employees, and lawsuits.

58. Captain William Tobin, Lieutenant Thomas Bouyer, Sergeant Kelley Sealy, Captain John Marchica, Assistant Chief Gary Strebel, Assistant Chief Donna Jones, Robert

Pittman, Andrew Townes and Denzil Snoddy have been inside BCB and have walked through, visited and/or toured BCB as part of their duties and responsibilities.

59. Captain William Tobin, Lieutenant Thomas Bouyer, Sergeant Kelley Sealy, Captain John Marchica, Assistant Chief Gary Strebel, Assistant Chief Donna Jones, Robert Pittman, Andrew Townes and Denzil Snoddy have observed pre-arraignment detainees in cells in BCB.

60. Captain William Tobin, Lieutenant Thomas Bouyer, Sergeant Kelley Sealy, Captain John Marchica, Assistant Chief Gary Strebel, Assistant Chief Donna Jones, Robert Pittman, Andrew Townes and/or Denzil Snoddy were the municipal officials responsible for setting the final policies on the operation of BCB when Plaintiffs and the Class were held in the facility.

61. Captain William Tobin, Lieutenant Thomas Bouyer, Sergeant Kelley Sealy, Captain John Marchica, Assistant Chief Gary Strebel, Assistant Chief Donna Jones, Robert Pittman, Andrew Townes and Denzil Snoddy failed to implement adequate remedial measures to address the unlawful conditions that existed in BCB when Plaintiffs and the Class were held in the facility and tacitly authorized the conditions.

62. The City of New York, as an entity, had actual and/or constructive notice of the unlawful conditions that existed in BCB when plaintiffs were held in the facility through the observations of its high-level officials, including policymakers, from reports from municipal officials and employees, and from documents, letters, complaints from detainees and City employees, and lawsuits.

63. The unlawful conditions of BCB have been in existence for over thirty years and constitute a persistent, well-settled and pervasive practice or custom that the City of New York

and its high-level officials, including policymakers, have allowed to exist, despite the injurious effects that the conditions have had on pre-arraignment detainees. Despite having both actual and constructive notice of the unlawful conditions, the City and high-level municipal officials, including policymakers, failed to implement adequate remedial measures and tacitly authorized the conditions.

64. The City of New York and high-level municipal officials, including policymakers, have exhibited deliberate indifference to the unlawful conditions that existed in BCB when Plaintiffs and the Class were held in the facility by failing to train municipal employees, contractors and agents on how to maintain safe and humane conditions in the facility, and by failing to retrain, discipline and/or terminate those who contributed to the deprivations. Rather than take appropriate remedial action, the City and high-level municipal, including policymakers, knowingly acquiesced in the unlawful behavior of their subordinates, contractors and agents.

**E.     Damages**

65. As a result of Defendants' actions, Plaintiffs and the Class suffered damages, including, but not limited to, emotional distress, mental anguish, fear and anxiety.

## FIRST CLAIM

### § 1983; VIOLATION OF DUE PROCESS
(On Behalf of Plaintiffs and the Class Against all Defendants)

66. Plaintiffs repeat the foregoing allegations.

67. The Due Process Clause of the Fourteenth Amendment imposes a duty on municipalities and municipal officials and employees to take reasonable measures to ensure that pre-trial detainees are held under safe and humane conditions.

68. Moreover, because pre-trial detainees have not been convicted of any crime and are presumed innocent, they may not be punished in any manner. Accordingly, punitive or punishing conditions of confinement may not be lawfully imposed on them.

69. The Defendants breached their duty under the Fourteenth Amendment and/or punished Plaintiffs and the Class by subjecting them to conditions in BCB that, either alone or in combination, posed an unreasonable risk to the health or physical and mental soundness of Plaintiffs and the Class.

70. The Defendants were deliberately indifferent to the unlawful conditions of BCB as they knowingly imposed the conditions or recklessly failed to act with reasonable care to mitigate or lessen the risk that the conditions posed to the Plaintiffs and the Class, even though the Defendants knew, or should have known, that the conditions posed an excessive risk to Plaintiffs' and the Class's health or safety.

71. The unconstitutional conditions that existed in BCB when Plaintiffs and the Class were held in the facility were a policy, practice and/or custom of the City of New York.

72. Defendants' conduct caused Plaintiffs and the Class to suffer various personal injuries, including the injuries described herein.

73. As a result of the foregoing, Plaintiffs and the Class are entitled to injunctive relief, and compensatory and punitive damages in an amount to be determined at trial.

## SECOND CLAIM
## § 1983; SUPERVISORY LIABILITY
(On Behalf of Plaintiffs and the Class Against the Individual Defendants)

74. Plaintiffs repeat the foregoing allegations.

75. The individual Defendants are liable to the Plaintiffs and the Class under the Fourteenth Amendment because they: (a) participated directly in the constitutional

violations; (b) failed to remedy the illegal practices at issue after being informed of their existence; (c) created a policy, practice or custom under which the unconstitutional practices occurred, or allowed the continuance of the policy, practice or custom; (d) were grossly negligent in supervising the subordinates who committed the wrongful acts; and/or (e) exhibited deliberate indifference by failing to act on information indicating that unconstitutional acts were occurring.

76. Defendants' conduct caused Plaintiffs and the Class to suffer various personal injuries, including the injuries described herein.

77. As a result of the foregoing, Plaintiffs and the Class are entitled to injunctive relief, and compensatory and punitive damages in an amount to be determined at trial.

## THIRD CLAIM
## § 1983; FAILURE TO INTERVENE
(On Behalf of Plaintiffs and the Class Against the Individual Defendants)

78. Plaintiffs repeat the foregoing allegations.

79. The individual Defendants, while acting under color of state law, had a reasonable opportunity to prevent the violations of the rights of Plaintiffs and the Class under the Fourteenth Amendments, but they failed to fulfill their constitutional obligation to intervene and address the unlawful conditions that existed in BCB when Plaintiffs and the Class were held in the facility.

80. Defendants' conduct caused Plaintiffs and the Class to suffer various personal injuries, including the injuries described herein.

81. As a result of the foregoing, Plaintiffs and the Class are entitled to injunctive relief, and compensatory and punitive damages in an amount to be determined at trial.

17

# FOURTH CLAIM
## NEW YORK STATE CONSTITUTION
(On Behalf of Plaintiffs and the Class Against all Defendants)

82. Plaintiffs repeat the foregoing allegations.

83. The foregoing conduct violates the Due Process Clause of Article I, §6 of the New York State Constitution.

84. The individual defendants were agents of the City of New York and were at all relevant times acting within the scope of their employment.

85. As a result of the foregoing, Plaintiffs and the Class are entitled to injunctive relief, and compensatory and punitive damages in an amount to be determined at trial.

86. Defendant City of New York, as the employer of the individual Defendants, is liable for the injuries of the Plaintiffs and the Class under the doctrine of respondeat superior.

WHEREFORE, Plaintiffs request the following relief jointly and severally against the Defendants:

   a. An order certifying the Class;

   b. An injunction requiring Defendants to remedy the unconstitutionally inhumane conditions in BCB;

   c. Compensatory damages in an amount to be determined by a jury;

   d. Punitive damages in an amount to be determined by a jury;

   e. Attorney's fees and costs;

   f. Such other and further relief as the Court may deem just and proper.

DATED: January 28, 2021

*/s/ Richard Cardinale*

---------------------------------

RICHARD CARDINALE
Attorney at Law
26 Court Street, Suite # 1507
Brooklyn, New York 11242
(718) 624-9391
richcardinale@gmail.com

STEPHEN BERGSTEIN
BERGSTEIN & ULLRICH
Attorneys at Law
5 Paradies Lane
New Paltz, New York 12561
(845) 469-1277

SCOTT A. KORENBAUM
Attorney at Law
11 Park Place, Suite # 914
New York, New York 10007
(212) 587-0018

JASON L. SOLOTAROFF
GISKAN SOLOTAROFF & ANDERSON LLP
Attorneys at Law
90 Broad Street, 10th Floor
New York, New York 10004
(212) 847-8315


Attorneys for Plaintiffs and the Class